2014 OK CIV APP 98

**In re The Marriage of M.D. FINKEN-STAEDT, Petitioner/Appellant,**

v.

**J.R. FINKENSTAEDT, Respondent/Appellee.**

**No. 110,716.**

Court of Civil Appeals of Oklahoma, Division No. 1.

Nov. 19, 2014.

---

Tamera Ann Childers, Jones, Gotcher & Bogan, P.C., Tulsa, Oklahoma, and Scott Hester, Edmond, Oklahoma, for Petitioner/Appellant.

N. Scott Johnson, Patrick H. McCord, N. Scott Johnson & Associates, P.L.L.C., Tulsa, Oklahoma, for Respondent/Appellee.

WM. C. HETHERINGTON, JR., Vice–Chief Judge.

¶ 1 In this appeal from a decree dissolving the twenty-year marriage between Petitioner M.D. Finkenstaedt (Wife) and Respondent J.R. Finkenstaedt (Husband), Wife challenges the trial court's division of property and its award of child support and support alimony. Based on the record evidence, we **affirm.**

### SUMMARY OF CASE

¶ 2 According to the undisputed facts, the parties married in 1991 while Husband was attending his second year of podiatry school in Chicago. Wife moved to Chicago from Tulsa and got a job to help with their living expenses. Husband obtained student loans to finance his medical education. The parties' first child was born in 1992.

¶ 3 After Husband completed a two-year residency, the family moved to Tulsa. Wife obtained employment at Bank of Oklahoma, and Husband began working with a local podiatrist. A second child was born in 1998, and the next year Husband commenced employment at Green County Podiatry, at which he later became a partner. In 2000, the parties paid off $10,000 in credit card debt and $35,000 toward Husband's $150,000 in

student loans with money he inherited from his grandmother.

¶ 4 In 2003, Wife gave birth to their third child. Husband was still practicing podiatry in September 2007 when he accepted an invitation to become a member and agreed to purchase 10 "units" (stocks or shares) each in two related limited liability companies (L.L.C.), Tulsa Spine and Surgical Hospital (TSSH), a physician-owned specialty hospital which owns the equipment used within the facility, and Shadow L.L.C. (Shadow), which entity owns and manages the TSSH facility and real estate on which the latter is located.

¶ 5 The separate subscription agreements Husband executed for TSSH and Shadow required him to comply with each entity's operating agreement. Unlike Shadow's operating agreement, TSSH's operating agreement limited ownership of shares to physicians licensed in Oklahoma, and both agreements required the "record owner" to sell the shares to TSSH upon certain "disqualifying events," including death or retirement. Husband financed the TSSH and Shadow stock purchases with a single loan from a bank in Stillwater, Oklahoma (Bank), for which he authorized payments from quarterly dividends distributed by either entity. According to the undisputed evidence, Bank received half of every dividend paid thereafter and the remaining half was paid directly to Husband, who testified he applied such funds for the taxes on the two investments.

¶ 6 In the Fall of 2008, the parties began experiencing marital problems. They obtained an attorney and began in February 2009 a so-called "collaborative divorce," during which the parties remained in the marital home and attempted to amicably settle their marital dissolution issues.[1] On March 20,

---

1. Neither party provided any further information regarding the "collaborative divorce," for which we find no statutory authority in Oklahoma. Our research reveals it is "one of the newest ways of handling divorces with children" which requires "lawyers and clients to enter into an agreement with the opposing party and counsel that all will engage in good faith negotiations and the lawyers will not take the dispute to court." *See Child Custody Practice and Proce-*

*dure,* § 1:15, Collaborative Law. If a settlement is not reached, "both lawyers must withdraw and the parties must seek trial counsel if they wish to pursue action in court." *Id.* States such as Texas, Utah, and North Carolina "are beginning to allow for collaborative law by either statute or court rule." *Id.* In Texas, "[c]ollaborative law is "a variety of alternative dispute resolution, used most commonly in the context of divorce" which was "developed in Minnesota in 1990" and "af-

2009 Wife filed a Petition for Dissolution and Application for Temporary Order in Tulsa County District Court, the latter of which requested, *inter alia*, child support and temporary support alimony.

¶ 7 Eleven days later, March 31, 2009, Husband executed a Subscription Agreement for "Olympia Medical Development, L.L.C." (OMD),[2] subscribing to become a member and agreeing to tender "$4,374.80 for 10 Units" in OMD and to be bound by all the terms and provisions of OMD's Operating Agreement. On April 15, 2009, Husband obtained from Bank a $4,571.80 loan with a six-month maturity date.

¶ 8 On or about April 23, 2009, the parties reached an agreement which they presented for court approval. On May 20, 2009, the trial court signed and filed the Agreed Temporary Order, which stated the parties were residing in the marital residence "while in the process of listing it for sale, and so long as they did so, payment of temporary child support and support alimony would be waived." The parties further agreed "to continue to be jointly responsible for the mortgage, utilities and expenses" and expressly reserved the issues of responsibility for such expenses and temporary alimony in the event one of the parties vacated the marital residence.

¶ 9 Between May and September of 2009, both parties testified they attempted reconciliation of their marriage. In June of that same period, Husband filed an Answer and Counterclaim in the dissolution proceedings and paid off the loan for the OMD stock. During a family vacation in the Cayman Islands in July, Husband was unexpectedly terminated as a partner in Green County Podiatry. By the end of that month the remaining partners and Husband settled on the terms of his severance pay and buy-out of his interest. In August Husband could not find a podiatry practice to join so he opened his own, Greater Tulsa Foot and Ankle Center.

¶ 10 Neither party testified exactly when their attempted reconciliation ended, however Husband moved out of the marital home in November 2009, and the next month he began paying child support. At the time of separation, Wife was still employed at Bank of Oklahoma, earning $70,000.00 annual gross income, and on advice of counsel, she did not seek temporary support alimony. Wife remained in the 4,400 square foot marital home until it sold in May 2010, at which time she purchased another home in which she and the minor children resided at the time of trial.

¶ 11 The parties filed written trial stipulations regarding the parties' pre-trial division of certain marital funds and real and personal property. A trial was held on their unsettled issues over three separate days in October 2011, during which the trial court heard testimony from Husband, Wife, her expert witness, a CPA, and Husband's two witnesses, his tax preparer and the attorney who drafted the various agreements for TSSH, Shadow, and OMD. The parties submitted for admission into evidence numerous exhibits, predominantly without objection.

¶ 12 The trial court adopted the parties' trial stipulations as part of its detailed "Findings of Facts and Conclusions of Law" filed on January 17, 2012, in which he accepted Husband's proposed distribution of the marital estate with minor adjustments and ruled on the remaining issues presented at the trial. On January 25, 2012, the court filed its 23-page "Amended Findings of Fact and Conclusions of Law" with no obvious substantive changes to any of his prior factual findings or legal rulings. After the filing of the Decree of Dissolution, Joint Custody Plan, and child support computation forms for 2009–2011, Wife filed this appeal.[3]

---

tempts to foster an amiable rather than an adversarial atmosphere by creating a four-way agreement between each party and their attorneys ...." *In re Mabray*, 355 S.W.3d 16, 23–24(Tex.App.-Houston [1 Dist.] 2010).

2. Husband testified OMD creates and develops hospital specific ideas for use within similar hospitals around the State of Oklahoma.

3. In his Answer Brief, Husband argues the issues of OMD's valuation and support alimony raised in Wife's Brief in Chief were not "properly preserved" for appellate review because neither was raised in her Petition in Error or not raised below. Wife correctly points out that Okla.Sup. Ct. R. 1.26(b), in pertinent part, provides "[t]he petition in error will be deemed amended to

## STANDARD OF REVIEW

¶ 13 For reversal, Wife alleges error with the trial court's valuation of the marital shares in TSSH and Shadow, and with finding the OMD shares are Husband's separate property. She also challenges the trial court's computation of child support and his award of support alimony.

 ¶ 14 This court will not disturb a trial court's judgment regarding property division or alimony absent a clear abuse of discretion or a finding the decision is clearly contrary to the weight of the evidence. *Peyravy v. Peyravy*, 2003 OK 92, ¶ 13, 84 P.3d 720, 723. The same review standard applies to child support issues, which are also matters of equitable cognizance. *Merritt v. Merritt*, 2003 OK 68, ¶ 7, 73 P.3d 878, 881.

## ANALYSIS

### Property Division

¶ 15 Wife specifically argues the trial court erred by valuing Husband's interest in TSSH, Shadow, and OMD pursuant to the buy-sell provisions of each entity's subscription agreements, and by not providing for an equitable division of the dividends generated by those investments after their separation. She claims error with the trial court's classification of the OMD shares as Husband's separate property. We begin with the latter allegation first.

### OMD Shares as Separate Property

#### The Parties' Arguments

 ¶ 16 To support her position the OMD shares should have been classified as marital property, Wife contends Husband signed the subscription agreement only eleven days after she filed the petition for dissolution and the agreement became "effective date as of January 15, 2009." She also argues Husband admitted the funds he used to purchase OMD were "marital funds," the parties had attempted reconciliation for months after the

include errors set forth in the propositions in the brief-in-chief, provided that in no event may the appeal be broader in scope than allowed by Rule 1.26(a)." The latter subsection limits the scope of this appeal (during which dissolution proceed-

filing of the petition, and that he did not move out of the marital home until November of 2009.

¶ 17 Husband contends at the time Wife filed the petition and he executed the subscription agreement, they were involved in a "collaborative divorce process" and were living in separate areas of the marital residence while trying to settle their property division, custody and support issues amicably. He claims the OMD shares were purchased with borrowed monies in April 2009, the loan was "his sole and separate debt taken out after the date of filing and during the parties' separation," and it "was paid off by [him] with funds earned by him after the date of filing the petition." Husband dismisses any relevance of the parties' reconciliation, claiming "it was unsuccessful and did not begin until well after the date of filing the Petition." Finally, he contends the TSSH Subscription Agreement's effective date was actually March 31, 2009, relying on 15 O.S.2011 § 138, which provides "a contract in writing takes effect upon its delivery to the party in whose favor it is made, or to his agent."

¶ 18 The trial court found the OMD shares were purchased by Husband "post-filing," *i.e.*, after March 20, 2009, the date the dissolution petition was filed, which finding implies rejection of Wife's argument based on the subscription agreement's effective date. Concluding the parties' intent and joint efforts had to be considered when determining the nature of the OMD stock, the court found

> the testimony was undisputed that *no joint funds or joint efforts* were attributed to the purchase of the stock or payment of the stock. In fact, the stock dividends received from the stocks paid the outstanding debt. Once again, [Husband] had to continue to practice medicine (*i.e.*, work) to receive the dividends.

Based thereon, the trial court listed the "OMD stock—purchased post filing" on the Husband's side of the marital estate with a zero value.

ing no motion for new trial was filed) to inclusion of "any error or any issue presented to and resolved by the trial court which is supported by the record." Based on our review of the record, both issues fall within the scope of this appeal.

¶ 19 As gleaned from the court's findings of facts and conclusions of law [4] regarding the question of division of TSSH and Shadow shares and dividends, there are two underlying bases for the above ruling: 1) *after the dissolution petition was filed,* the only dividends Husband received from which he could have paid off the loan to purchase the OMD stocks were TSSH dividends,[5] and 2) pursuant to the TSSH Operating Agreement Husband's entitlement to the those dividends depended on his separate efforts, *i.e.,* continuing to practice medicine. Since Wife's argument regarding the effective date of the OMD Subscription Agreement raises the question of joint ownership of the TSSH and Shadow shares *prior to the filing of the dissolution petition,* we first address that part of her appellate argument.

¶ 20 "Ownership of 'shares,' *i.e.* the right to participate in the control, management, the profits and surplus, and/or the distribution of the assets, of a corporation is a contractual relationship." *Don Johnston Drilling Co. v. Howard,* 1959 OK 183, ¶ 23, 347 P.2d 640, 648. Wife's argument on this point fails to consider the clear and unambiguous provision in the OMD Subscription Agreement that OMD's "acceptance" of Husband's membership would occur "when it is signed by a Manager of the Company." According to C.J.S., Corporations, § 256, "[a] subscriber of shares becomes an owner once a subscription is accepted by a corporation." A company representative signed the Agreement as "Manager" the same day as Husband on March 31, 2009, *i.e.,* post-filing of the dissolution petition.

¶ 21 However, even if the OMD Subscription Agreement could be construed as giving Husband contractual rights to the shares "effective as of January 19, 2009," *i.e.,* "pre-petition filing," the Supreme Court has long held that "[t]he determination of the issue as to separate ownership of property acquired during the marriage is dependent on the *original source* of the property." (Emphasis added.) *Smith v. Villareal,* 2012 OK 114, ¶ 8, 298 P.3d 533, 536 (citing *Longmire v. Longmire,* 1962 OK 219, ¶ 9, 376 P.2d 273, 275). Here, the uncontroverted evidence is the loan Husband obtained to pay for the OMD shares was paid off by "stock dividends."

¶ 22 In this case, the record testimony and evidence establishes the only stock which had paid dividends was TSSH, both previously *and* between the filing of the dissolution petition (March 20, 2009) and the loan pay-off date (June 9, 2009).[6] Importantly here, the parties agree the TSSH and Shadow shares [7] were acquired during the parties' marriage and were marital assets subject to equitable division.

¶ 23 " 'Jointly-acquired property' for the purposes of [43 O.S. Supp.2006 § 121] is property that is accumulated by the joint industry of both spouses during the marriage." *Duty v. Duty,* 2007 OK CIV APP 43, ¶ 3, 162 P.3d 939, 940 (Approved For Publication by the Supreme Court). "Property acquired during the marriage is presumed to have been jointly acquired, and the party seeking to have property categorized as separate property has the burden of proof." *Id.* "Future earnings are not marital property because they have not been acquired during the marriage." *Id.*

¶ 24 As the trial court correctly identified, the issue whether the TSSH dividends used to purchase the OMD shares were acquired by joint industry or by Husband's separate efforts is determined by his rights to future

---

4. We note for the record the court's express adoption and incorporation by reference into the Decree of Dissolution his "Findings of Fact and Conclusions of Law," filed January 17, 2012, and his "Amended Findings of Fact and Conclusions of Law," filed January 25, 2012.

5. The same exhibit establishes between the filing of the dissolution petition and the trial all but $2,000.00 of the $136,772.58 total dividends were paid by TSSH, and that half of each dividend was paid to Stillwater National Bank to reduce the loan for purchase of the shares in TSSH and Shadow and the remaining half was paid to Husband.

6. See Petitioner's Exhibits 42 and 43.

7. "As used in [Article IX, § 39] of The Oklahoma Constitution, the word 'stock' is used synonymously with 'shares of stock' or 'shares.' " *Don Johnston Drilling Co. v. Howard,* 1959 OK 183, ¶ 26, 347 P.2d 640, 648.

dividends under his contract with TSSH. *See Bigbie v. Bigbie*, 1995 OK 72, ¶ 11, 898 P.2d 1271, 1273 (whether future commissions on renewal of insurance policies are marital assets is determined by the agent's rights to those commissions under his/her contract with the insurance company).

¶ 25 Wife concedes in her Brief in chief that the TSSH Operating Agreement is unambiguous and also acknowledges it restricts stock ownership to a physician duly licensed to practice medicine in Oklahoma (*i.e.*, "qualified member").[8] The same Operating agreement prohibits transfer or assignment of units by a member (or Record Holder) to anyone except a "permitted transferee," limited by definition to "a grantor trust in which the Member is a Trustee, the sole grantor and the sole beneficiary, or a single member limited liability company in which such Member is the sole member and the sole manager" or a "qualified member ... [with] the consent of a super majority vote of the Members." Another section of the TSSH provides for "Dissociation of a Member," which upon occurrence of numerous "disqualifying events," *e.g.* death, retirement from the practice of medicine, disability to such a degree one would be unable to practice medicine, failure to meet a capital call,[9] requires sale of the member's units to TSSH at a set "purchase price," *i.e.*, "fair market value" determined by use of a specific formula. It is clear from the TSSH Operating Agreement as a whole, that if for any reason Husband ceases to practice medicine, he will be "dissociated" as a TSSH member with consequential loss of his rights to the shares and all future dividends or earnings.

¶ 26 Husband testified he was not an employee of TSSH but was an independent physician who has a contract with TSSH to perform services using its facility and personnel. Husband and Mr. Mysock, the attorney who drafted all of the agreements for TSSH, Shadow and OMD, testified Husband was not required by the Operating Agreement to admit patients to TSSH. Despite Wife and Husband both testifying the shares in TSSH and Shadow are "passive investments," the undisputed testimony established TSSH's continued viability *and* profitably depends on patient referrals to that hospital from all of its physician-owners, including Husband, who confirmed he referred patients from his practice to TSSH. In other words, without the combined efforts of Husband and the other physician-owners there would be no distributions in the form of dividends. This testimony in light of the clear and unambiguous TSSH Operating Agreement clearly supports the trial court's ruling that Husband's entitlement to post-petition dividends is dependent on his separate efforts.[10]

### Valuation of TSSH and Shadow Shares

¶ 27 Pointing out the court relied on *Mocnik v. Mocnik*, 1992 OK 99, 838 P.2d 500, for concluding he "must value the stock in accordance with the terms of the Stockholder's Agreement," Wife argues *Mocnik* does not apply here. Unlike the stock agreement in *Mocnik*, she argues the TSSH Operating Agreement allows Husband to sell his "units" of TSSH "to anyone he wishes at any price," which she then clarifies "the only requirement is that he sells to a 'qualified member' (a licensed physician) and he must obtain consent from two-thirds of the shareholders." Wife does not challenge the court's date of valuation for any of the properties.

¶ 28 Wife's argument fails to consider Husband's testimony that he did not plan on ever

8. The definition of "qualified member," see Article II, Section 2.01, also "a professional corporation or such other person other than a natural person that meets the requirements of, and complies with the provisions of, Section 11.03 of this Agreement." The latter section applies to the admission of a "Corporate Member" as an additional member, which requires "all equity owners of the Corporate Member must be Qualified Members."

9. Other disqualifying events include "the divorce of a Record Holder and the assignment by a court to a Record Holder's spouse pursuant to a domestic relations order (QDRO)," circumstances indicating financial difficulties, e.g., filing of bankruptcy or appointment of receiver or trustee, and attempts at unauthorized transfers of shares to third parties.

10. The court also explained that both parties had included the dividend income in their child support computations and discussed in great detail the consequences, tax and otherwise, if he were to award the dividends as post-filing marital property. Record, p. 111.

selling his shares in TSSH, Shadow or OMD because they were good investments. More importantly, she admits in her Reply Brief that her expert witness did not perform a forensic valuation of TSSH, Shadow, or OMD and did not calculate the present value of the shares in those companies. Because she could not own TSSH shares, Wife requested at trial "to receive 50% of the distributions going forward" or "until the units are sold," which request her proposed findings of facts and conclusions of law clarified as a "continuing interest in the stock dividends." Further, instead of providing a definite value in her proposed equitable distribution (Petitioner's Replacement Exhibit No. 23), she simply typed in "equally divided over time" next to the TSSH, Shadow and OMD shares.

¶ 29 Wife's valuation evidence consisted of establishing the total dividends paid to Husband by TSSH between the filing of the dissolution petition through the date of trial (March 31, 2009–September 2011), from which her expert CPA then projected an amount for the last quarter of 2011 and made two present value calculations of the cash or income flow from those dividends for a five year period. However, as the trial transcript reveals, the assumption on which Wife's expert's projection and present value calculation of the dividends were based, i.e., an "upward trending" of the dividends, was discredited by Husband's testimony, the parties' tax returns (K–1 forms), and Wife's exhibit of March 2009–September 2011 dividend payments. This calculation failed to consider all dividend periods selecting only periods that supported her position, i.e., 2008 dividends, thus choosing specific quarters to compare to achieve the desired result. A comprehensive calculation of the entire investment term would actually show a downward trend in dividends.

¶ 30 Wife provided no evidence of the present value of Husband's interest in Shadow at any point in time. Her only valuation evidence is based on Husband's *future* dividends, i.e., earnings from TSSH, which the trial court properly concluded was based on his separate efforts and not divisible marital property. As a result, Husband's evidence of the value of his shares in Shadow and TSSH at the time of separation, based on the fair market value formula as calculated pursuant to each entity's operating agreement, was the only evidence the court received to value the parties' interest in these properties.

¶ 31 The court's valuation based on its interpretation of the TSSH and Shadow Operating Agreements is supported by *Carpenter v. Carpenter*, 1983 OK 2, 657 P.2d 646. Like Husband's interest in TSSH, goodwill in the plaintiff's stock ownership in *Carpenter* was not an issue. Because the plaintiff's ownership was subject to a contractual obligation to sell it upon death, disability, retirement, or termination for any reason at book value, the Court in *Carpenter* held the trial court "did not abuse its discretion or go against the weight of the evidence in determining the stock's value at book value." *Id.*, ¶ 32, 657 P.2d at 652–653. We find the same holding applies to the trial court's valuation of Husband's shares in TSSH and Shadow in this case.

### *Child Support Computations*

¶ 32 Wife appeals the trial court's setting of Husband's gross monthly income as $10,735.66 and its award of $732.73 per month child support for two children. Pointing to record evidence of his 2010 gross income as $148,454.00, or $12,371.17 per month, she argues the parties' total combined monthly income exceeds the guidelines cap of $15,000.00 per month, and the court's refusal to allow child support in excess of the guidelines is error and should be reversed.

¶ 33 Wife requested a much larger child support award based on her position that Husband's income was $210,000.00 per year (or $17,500.00 per month).[11] According to the Amended Findings of Facts and Conclusions of Law, the trial court expressly declined Wife's request to disregard the historical income, tax returns and documentation of Husband's income and to instead accept the $210,000.00 income total that he had listed on a 2009 credit application for purposes of calculating child support. The court noted, *inter alia*, the credit application was submitted

11. See Petitioner's Exhibit No. 19.

when the parties were still residing together, found the income tax returns were controlling, and adopted the three-year average of gross income reported on Husband's U.S. Individual Tax Return Form 1040(s).[12] Based on our review of the record, Wife has not demonstrated the court's finding of Husband's gross income is clearly contrary to the weight of the evidence or an abuse of discretion.

¶ 34 Relying on *Archer v. Archer*, 1991 OK CIV APP 28, ¶ 11, 813 P.2d 1059, 1061 (Approved for Publication by the Supreme Court), for holding "the trial court should consider the childrens' needs, and the parents' ability to pay and prior standard of living" when confronted with parental incomes exceeding the then-current Guideline "cap," Wife argues the $732.73 child support the court awarded "is completely inadequate to maintain the childrens' prior lifestyle" and "will not even come close to paying mortgage and utilities for a home consistent with the lifestyle of the children during the marriage."

¶ 35 As here, "[w]hen parental income exceeds the guideline table,[13] the children's minimum financial needs are set by the guidelines and needs over the minimum are based upon the circumstances of each case."

*Kerby v. Kerby*, 2002 OK 91, ¶ 7, 60 P.3d 1038, 1041(citing *Archer* and 43 O.S.2001 § 119(B) [14]). "Where the parents' income exceeds the maximum addressed in the table, a determination of the children's needs and the parents' ability to pay in excess of the tables' standards are within the trial court's discretion." *Id.*

¶ 36 In this case, the court expressly declined Wife's request "to deviate" from the child support guidelines, finding in the Amended Findings of Fact and Conclusions of Law, "[Wife] failed to establish that the children have needs over and above child support, save and except that the activity expenses of the children created an added expense." Our review of the record confirms this finding, and Husband's argument of insufficient evidence of the parties' alleged prior affluent lifestyle.[15] In addition, the trial court supported its decision not to award child support in excess of the maximum set in the guideline table on the parties' stipulation that Husband was bound to continue to pay one-half of the extra curricular activity expenses agreed upon by the parties, which the court noted had historically been $560.89 over and above his payments of child support. Wife has not demonstrated the trial

12. All three years of Husband's returns included the dividend income stream from the investments.

13. Instead of $5,890.48, the parties' stipulated monthly gross income for Wife pursuant to Husband's Answer Brief, we note the trial court instead used $5,871.00, based on her Exhibit No. 4, "Pay Statements through September 30, 2011" in its Child Support Computation filed April 26, 2012. As indicated on the latter document, the parties' combined monthly gross income is $16,606.66, and the amount of "base monthly obligation" from the Guideline Schedule is $1,961.00, the maximum for two children when the combined gross monthly income is $15,000.00. Record p. 156–157.

14. Effective June 6, 2000, the Legislature amended the $10,000.00 maximum combined monthly income in the Guidelines, as discussed in *Archer*, by increasing it to $15,000.00. The current version, 43 O.S.2011 § 119(B), still provides "[i]f combined gross monthly income exceeds *Fifteen Thousand Dollars* ($15,000.00), the child support *shall be that amount* computed for a monthly income of Fifteen Thousand Dollars ($15,000.00) *and an additional amount determined by the court.*" (Emphasis added.)

15. Wife replies to Husband's argument, claiming she "provided a budget showing her needs and the needs for the minor children indicating that her total monthly living expenses were $11,752.30." Although Wife identified "Exhibit No. 90" as "the expense work sheet [she] created" and affirmed it accurately "depicted [her] and the childrens' monthly expenses as $11,752.30," Exhibit No. 90 was never submitted to the trial court for admission into evidence. Consequently, it is not part of the appellate record. Further, there is no testimony regarding specific entries listed on Exhibit 90 which might have supported the childrens' financial needs over and above the minimum support provided by the Guidelines Schedule. Although Wife testified her current expenses for the children were not significantly different than when she and Husband had an intact family and that "the lifestyle represented in [Exhibit 90]" is "about the same as the lifestyle [they] had when [she] and [Husband] were together," there is no testimony or record evidence either of the parties' prior monthly living expenses or of the childrens' prior lifestyle.

court abused its discretion. The trial court's child support award is not against the clear weight of the evidence and must be affirmed.

### Support Alimony

¶ 37 Wife argues that in light of the parties' lengthy marriage and affluent lifestyle and their 4,400 square foot marital home, the trial court's award of $1,500.00 per month in support alimony and of $732.00 per month in child support together with her $2,930.51 net monthly income at the time of trial, "are woefully inadequate to meet her asserted needs of $11,752.00."

¶ 38 As previously noted in our discussion of child support, Wife failed to admit any evidence of her asserted needs. Further, the trial court's detailed Amended Findings of Fact and Conclusions of Law on this issue considered, *inter alia*, not only Husband's future earning capacity but also Wife's receipt of the vast majority of the parties' personal property, considerable cash monies, and all the profit from the sale of the marital residence. The court also considered Wife's post-receipt use of those marital funds, her post-separation debt incurred by following advice of counsel and not seeking temporary support alimony between separation and trial, and her present income when deciding she had proven need for alimony to rehabilitate during the post-dissolution adjustment period. Based on the evidence presented at trial, we conclude Wife has neither demonstrated an abuse of discretion nor that the trial court's findings are clearly against the weight of the evidence. That part of the Decree of Dissolution of Marriage ordering Husband to pay Wife support alimony in the total sum of $60,000.00 is affirmed.

### CONCLUSION

¶ 39 The trial court's division of property, award of support alimony and child support is neither contrary to the clear weight of the evidence nor an abuse of discretion. Its judgment is **AFFIRMED.**

JOPLIN, P.J., and BUETTNER, J., concur.